`IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

LEILONI POPOALII,                    )
                                     )
            Plaintiff,               )
                                     )
    v.                               )        Case No. 05-04120-CV-C-NKL
                                     )
CORRECTIONAL MEDICAL                 )
SERVICES, INC., et al.,              )
                                     )
            Defendants,              )
                                     )

ORDER

While she was incarcerated with the Women's Eastern Reception Diagnostic and

Correctional Center ("WERDCC"), Plaintiff Leiloni Popoalii ("Popoalii") went blind as

the result of cryptococcal meningitis. She brings this civil suit against her jailers and the

medical personal who treated her in prison under 42 U.S.C. § 1983 for violation of her

Eighth Amendment right against cruel and unusual punishment. Defendants Rebecca

Patterson, Bruce Sharp, Mark Trusty, Renee Samm, Mary Ann White, Stephen Taylor,

Christina Hancock, Linda Rose, Thomas Dunn, James Wilder, Scott Neagles, Tom

Schmidt, William Vallier, Alan Ham, George Foster, Lisa Schoneboom, Colin Nichols

and Karen Morris (collectively, the "MDOC Defendants") move for summary judgment

in Document No. 228. Defendants Correctional Medical Services, Inc. ("CMS"), Earl

Cox, Sripatt Kulkanthorn, Marilyn Meyer, Wendy Hull, Debbie Welch, Teresa

Vanlandingham, and Vicki Dixon (collectively, the "CMS Defendants") move for

1

summary judgment in Document No. 229. Defendant Raymond Bloomquist

("Bloomquist") moves for summary judgment in Document No. 227. For the reasons set

forth below, the motions are granted.

## I.      Motions to Strike

As a threshold matter, Defendants have moved [Docs. # 239 and 243] to strike the

Affidavit of Popoalii's medical expert Jerrold S. Dreyer, M.D., attached to her

Suggestions in Opposition to their Motions for Summary Judgment.   The Court's

October 20, 2005 Scheduling Order required Popoalii to designate experts by July 3,

2006.  Popoalii designated Dr. Jerrold S. Dreyer in timely fashion and produced his three

paragraph report to Defendants, who subsequently took Dr. Dreyer's deposition at his

office in California on July 31, 2006.  During that deposition, Dr. Dreyer was asked

whether his three paragraph report completely and accurately summarized his opinions.

He answered in the affirmative and stated that he had produced no further reports.

The affidavit of Dr. Dreyer attached to Popoalii's Suggestions in Opposition to the

Defendants' Motions for Summary Judgments contains the following additional opinion

testimony not included in his original report and not mentioned by him during his

deposition:

> c. The defendants' failure to immediately obtain and review Plaintiff's
> medical records hampered their ability to adequately assess and treat
> Plaintiff's condition in that defendants – specifically the treating nurses and
> physicians at the correctional facility – could not know which of Plaintiff's
> body systems to test and monitor, and that they therefore did not know how
> to properly treat Plaintiff.  In particular, the defendants failed to test and
> monitor Plaintiff's intracranial pressure prior to April 8, 2004, and that

appropriate testing/monitoring thereof could have likely prevented Plaintiff's blindness.

B. Had the defendants obtained and reviewed Plaintiff's medical records, it is more likely than not that the defendants would have been able to plan a course of appropriate treatment such that Plaintiff could have avoided blindness as a complication of her condition. In particular, Plaintiff's spinal tap during her stay at St. Joseph's hospital prior to her admission to the correctional facility revealed an abnormal condition which should have been closely monitored.

These additional opinions were not disclosed to Defendants in accordance with the Court's Scheduling Order or Fed. R. Civ. P. 26(a)(2)(B), nor do they state which documents within the record they are based on. Defendants, therefore, have not had the benefit of deposing Dr. Dreyer on his additional opinions.

Popoalii counters by asserting that the affidavit does not contain anything new. If that is the case, then there is no prejudice to her if the affidavit is stricken. Given the lack of opportunity for Defendants to depose Dr. Dreyer on his new opinions and the lack of prejudice to Popoalii, the Court grants the Motions to Strike Dr. Dreyer's affidavit.

## II. Factual Background

The following facts are viewed in a light most favorable to Popoalii as the non-moving party, and all reasonable inferences are drawn in her favor. From April 2003 to March 19, 2004, Popoalii was incarcerated with the St. Charles County Department of Corrections. She began complaining of headaches in February 2004, for which she was eventually hospitalized at St. Joseph's Health Center and diagnosed with viral encephalitis. On March 19, 2004, Popoalii was transferred from St. Charles to the

Women's Eastern Reception and Diagnostic Correctional Center ("WERDCC") in Vandalia, Missouri.

### A. Popoalii's Treatment by WERDCC Correctional Staff

Upon arrival at WERDCC, Popoalii was processed through the Receiving and Orientation Unit where she gave her medical history and underwent a brief evaluation by medical personnel. DOC custody and classification officers play no role in this evaluation or in gathering medical records. Because medical information is private, it is not generally disclosed to custody and correctional staff.

Medical staff generally make rounds through the Receiving and Orientation unit once per day, and there is a procedure through which prisoners can submit a Medical Services Request form and be seen by medical staff during sick call, which occurs once per day. Because Popoalii continued to complain of headaches, DOC Defendant Scott Neagles instructed her to go to sick call and ask for medication.

During an educational screening with special education teacher DOC Defendant Patterson, Popoalii said that her head hurt so bad she could not answer another question and just wanted to lie down. Patterson told her she did not have permission for a lay-in, and Popoalii said, "just take me to the hole," or administrative segregation. Patterson called a nurse in the medical unit to ask if she should proceed with testing Popoalii anyway and was told that she could. Patterson also called DOC Defendant Samm, who came to talk to Popoalii about her complaint. Popoalii told Samm that her head hurt and she just wanted to lie down. Samm called Receiving and Orientation Unit to inform them

4

of Popoalii's complaint and was told that she had just been to the medical unit and had not received a lay-in. Popoalii continued to complain of head pain and maintained that she could not continue the test and that they should just take her to the hole. Samm wrote Popoalii up on a conduct violation. Popoalii was interviewed by DOC Defendant Sharp a few days later about the conduct violation, but she did not offer any statement about the incident or specifically request medical attention at that time.

Popoalii was placed in administrative segregation on March 22 by order of Shift Supervisor DOC Defendant Trusty, though Trusty himself did not speak with or see Popoalii at the time since Sharp had already interviewed her about the conduct violation. Prior to being placed in segregation, Popoalii had been seen by medical staff twice since her arrival at WERDCC. Medical staff generally make rounds through segregation once per day. Correctional officers walk through the segregation unit constantly, and each cell has a call button which alerts an officer overseeing the unit that the prisoner needs medical help. On March 24, Popoalii screamed from severe back pain. DOC Defendant Hancock called the medical unit and spoke to an unidentified nurse practitioner who told Hancock that there was nothing wrong with Popoalii. During a head count on March 31, Hancock ordered Popoalii to sit up several times for the count, but Popoalii said she couldn't because her head hurt too much. She had also begun to hallucinate. She eventually complied, but was issued a conduct violation for the delay. Popoalii was interviewed by DOC Defendant Taylor for the conduct violation but made no statement during the interview. Neither Popoalii nor Taylor recall whether Popoalii asked for

medical attention during the interview. DOC Defendant White also conducted a disciplinary action hearing on March 31. She did not actually observe Popoalii at the time but asked her over the intercom whether Popoalii wanted to participate, and Popoalii said no.

On April 1, medical staff decided to transfer Popoalii from administrative segregation to the transitional care unit (TCU) located in the medical unit. At that time, Popoalii first reported that she could not see and that her head continued to hurt. Although custody officers were present in the TCU for safety and security reasons, they are not allowed to provide medical care to inmates. Nor are they even told why the inmates are in the TCU. Over the next few days, Popoalii had several episodes of loud screaming. Each time, she was told to stop by DOC Defendants Rose, Dunn, and Wilder because she was disturbing other patients. Popoalii also spilled her food and was told that if she did not clean up her mess and stop screaming, she would be returned to segregation. During this time, she was issued several conduct violations by the Officers. When one of these violation was read to her by DOC Defendant Nichols, Popoalii stated, "God my head hurts. I can't see very well. I haven't been able to see for the last two days. I want to sign it but I can't see." When DOC Defendant Neagles interviewed her about another violation, Popoalii told him she could not see well enough to sign it. She was sent back to administrative segregation on April 3 for the conduct violations by DOC Defendant Supervisor Vallier, though Vallier never saw Popoalii before issuing the transfer order. Popoalii was cleared for transfer by one of the nurses in the TCU.

6

On April 4, DOC Defendant Neagles observed Popoalii hitting her head on the wall of her cell, stumbling around, and falling over her bed. Neagles notified his supervisor and the mental health unit by filling out a suicide intervention form. He also called the medical unit to report the head banging. Popoalii was moved to a padded cell in the mental health unit and placed on full suicide watch. DOC Defendant Ham was listed as the shift supervisor on the suicide intervention form Neagles filled out, but non-party DOC officer Ruby Tyler was actually on duty at that time and Ham had no involvement.

Popoalii was transferred from the padded cell back to the TCU on April 6. She was subsequently taken to the emergency room at the Audrain Medical Center in Mexico, Missouri. At the hospital, Popoalii was diagnosed for the first time with cryptococcal meningitis and eventually transferred to the University of Missouri Health Center. Her experts admit that she most likely had cryptococcal meningitis even before coming to WERDCC.

While Popoalii was at the hospital, DOC Defendant Schoneboom participated in two disciplinary action hearings involving her on April 8. However, Schoneboom had no other contact with Popoalii. Neither did Popoalii have any contact with DOC Defendants Morris or Foster. There is no evidence that Popoalii ever spoke with DOC Defendant Ham and she doesn't know why Ham was named as a Defendant.

**B.     Popoalii's Medical Care at WERDCC**

During her intake evaluation upon arrival at WERDCC, Popoalii reported her medical history to Correctional Medical Services ("CMS") Defendant Nurse Earl Cox, including her recent hospitalization for viral encephalitis. She reported to another, unidentified nurse that she had bad headaches and that she could not see. She signed a form acknowledging her understanding of how to access medical and emergency care while at WERDCC. Cox saw Popoalii a short while later when she complained of head pain. She told Cox that she had a constant headache due to the encephalitis. Cox evaluated her vital signs, which were normal, and provided her with a "lay-in" restriction, which would allow her to remain in her bed, except to receive medical care or meals, rather than engaging in certain prison activities. He also directed her to report to the nursing sick call for further evaluation. Popoalii talked to an unidentified nurse who gave her ibuprofen for her headache. She continued to receive headache medicine in a timely fashion during her stay at WERDCC. Nurse Cox had no further contact with or role in Popoalii's medical care during the time at issue in this case.

CMS Defendant Nurse Marilyn Meyer saw Popoalii on March 20 for severe headache. Meyer assessed all of Popoalii's vital signs within normal limits. She assessed both of Popoalii's pupils as equal and reactive to the light, and found Popoalii to be alert, oriented, and balanced and able to speak and grip. Meyer noted that Popoalii was uncomfortable and told her to report to nursing sick call for further care.

Meyer's next contact with Popoalii occurred on March 26 in response to a Medical Service Request seeking an increased dosage of ibuprofen. Meyer received approval to

8

increase the dosage from the on call physician, Defendant Raymond Bloomquist. Meyer had no further contact and provided no further treatment to Popoalii during the time at issue in this suit.

CMS Defendant Nurse Practitioner Wendy Hull worked primarily in the emergency room at WERDCC during all relevant times. She saw Popoalii on March 21 for severe headache. Popoalii told her she had been previously hospitalized for viral meningitis which was causing her headache. Hull assessed Popoalii's vital signs as within normal limits and provided her with a 24-hour lay-in.

Hull saw her again on April 1 when she was admitted to the Transitional Care Unit for evaluation and observation. Over the next two days, Popoalii received two conduct violations from corrections officers for screaming in the infirmary and disturbing other inmates, and she was transferred back to administrative segregation on April 3. Because an inmate cannot be transferred to segregation without a prior medical evaluation, Hull evaluated Popoalii again on April 3. Popoalii complained of headache for which Hull gave her as much ibuprofen as prescribed. Because her vital signs were normal, Hull deemed Popoalii medically fit for transfer to segregation.

Following the report on April 4 that Popoalii was banging her head against the wall in segregation and had been moved to a padded cell, Hull again evaluated her. Popoalii told Hull that she could not see. Hull performed eye reflex tests and checked whether her eyes were equal and reactive to light. She also tested neurological function and vital signs. She remained with Popoalii for an hour to observe her, during which time

9

Popoalii did not change or worsen. Hull did not see Popoalii again during times relevant to this litigation.

CMS Defendant and Practical Nurse Debbie Welch saw Popoalii for complaints of a headache on the morning of March 22. Popoalii mistakenly told her she had been recently discharged from the hospital with viral meningitis (as opposed to encephalitis). Welch took her vitals, checked that her pupils were equal and reactive to light, checked that her smile was equal on both sides, and that she could grip, push, and pull. Welch assessed an "alteration in comfort," meaning that Popoalii was uncomfortable and contacted CMS Defendant Dr. Sripatt Kulkanthorn to request a course of medical treatment. Kulkanthorn prescribed 800mg ibuprofen three times daily for ten days, which Welch administered.

Welch met with Popoalii again on April 1 to inform her of the results of a TB test. There is no evidence that Popoalii complained of headache or other symptoms during this meeting. Welch had no further contact with Popoalii at times relevant to this law suit.

Also on March 22, Popoalii was evaluated by non-party Nurse Carrie Oliver for a complaint of a severe headache. Popoalii reported to Oliver a recent history of viral meningitis (as opposed to encephalitis), and Oliver had her sign a release to obtain prior medical records. Oliver also called Defendant Dr. Raymond Bloomquist to come evaluate Popoalii in administrative segregation. Bloomquist is an independent contractor for Medical Doctor Associates, Inc ("MDA"). Through MDA's contracting arrangement with CMS, he provides care as a *locum tenens* doctor for CMS who in turn contracts with

10

the Department of Corrections to provide medical care to prisoners.  The only period relevant to this lawsuit in which Bloomquist worked at WERDCC was from March 19 through March 26.  He has no independent recollection of treating Popoalii during that time and relies exclusively on her treatment notes for his testimony.

When he was called by Nurse Oliver, Bloomquist evaluated her neck and found it flexible with no nuchal rigidity.  She was responsive, coherent, and her vital signs were stable.  He ordered ibuprofen for her pain.  He does not recall being aware of her reported history of encephalitis or meningitis, or that she was sensitive to light.  Had he known of this history, it would not have affected his treatment absent some objective symptom of those ailments.  Had he known of the light sensitivity in conjunction with a history of encephalitis, it would have been a "red flag" to him.

Bloomquist's only other involvement in Popoalii's care was on March 26 when Nurse Meyer called him about increasing Popoalii's dose of ibuprofen due to pain.  He increased the dosage.

CMS Defendant Kulkanthorn is a physician employed by CMS as an independent contractor.  His first involvement in Popoalii's case occurred on March 22 when Nurse Welch consulted him about Popoalii's headaches and he prescribed ibuprofen.  He next saw Popoalii on April 1 for a scheduled appointment in regard to her headaches.  Popoalii reported head pain and said she had not been able to see for a couple of days.  She reported a history of headaches and a recent diagnosis with viral encephalitis.  Kulkanthorn examined Popoalii's head and neck.  He examined her eyes and pupils with

11

an opthalmascope and determined that her pupils were equal, reactive to light, and grounded. A neurological exam was also normal. He placed her in the TCU for observation and further evaluation of her headaches in light of her history of encephalitis. He encouraged more fluid intake and ordered a blood count. He prescribed ibuprofen and a shot of Visteril for the headache. He ordered her to lie flat and be placed on fall precaution due to her vision problems. Popoalii was placed in a room for observation by CMS Defendant Nurse Vanlandingham who assessed her skin, eyes, and vital signs as normal. Vanlandingham had no further contact other than April 1.

CMS Defendant Nurse Dixon observed Popoalii during the early morning hours of April 2. She assessed her vital signs, neurological signs, eyes and facial movements as normal, although she also noted that Popoalii began making noises and picking at things in the air. Dixon refused a request for pain medication at one point because it was not time to administer it and she didn't have permission to give extra medicine from a doctor. That night was Dixon's only contact with Popoalii during times relevant to this lawsuit.

Kulkanthorn saw Popoalii the morning of April 2. She still complained of headaches, but could walk around normally. She could also put her chin to her chest and move her head around without pain which would be inconsistent with meningitis. Her eye movement and neurological function was normal. Kulkanthorn assessed her as post viral encephalitis with headaches, poor vision, and depression. He reviewed her past medical records which Popoalii's mother had faxed to WERDCC sometime on or before

12

April 2.  He reviewed the records of her encephalitis diagnosis and a negative CT scan.
He also obtained results of new blood work and liver and thyroid tests.

Although Kulkanthorn ordered that Popoalii remain in the TCU for further
observation, she was removed to administrative segregation on April 3 without his
consent after she was twice cited for screaming and disturbing other inmates.  When he
discovered that she'd been removed on April 5, he requested that she be brought back to
the TCU.  She told him that she could not see any light.  He evaluated her pupils which
were equal and reactive to light, and he re-checked them with an opthalmascope but
found no infection, palsy, or conjunctivitis.  Her vital signs were normal and she was
calm and alert.  Her neck was not sore or stiff and she could move her head normally.

Kulkanthorn requested a consultation with opthalmologist Lee Browning to
evaluate Popoalii's visual complaints.  He also recommended a neurological consultation
with Dr. Dean and ordered additional blood work. On April 6, Dr. Browning evaluated
her complaints of vision loss and reviewed her blood work.  He also reviewed her medical
records including her history of viral encephalitis and negative CT scan.  Consulting with
Dr. Dean, Browning recommended an immediate MRI.  Popoalii was taken to the
Audrain Medical Center for the MRI and CT scan and was eventually diagnosed with
cryptococcal meningitis.  Because Audrain Medical Center did not have the expertise to
care for her, Popoalii was transferred to the University or Missouri Medical Center on
April 8.

C.      **Popoalii's Cryptococcal Meningitis**

13

Cryptococcal meningitis is an uncommon fungal infection, primarily associated with HIV positive and immuno-compromised individuals, which causes inflamation of the lining between the brain and the skull and the spine and the spinal cord. Popoalii was not HIV positive and had no known risk factors associated with the infection. Popoalii's infection was difficult to diagnose and its cause remains unknown.

Popoalii's medical expert Dreyer has opined that she never had viral encephalitis as diagnosed at St. Joseph's Hospital in February 2004, but in fact already suffered from cryptococcal meningitis at that time, prior to her transfer to WERDCC. Both Dr. Dreyer and Popoalii's opthalmology expert, Dr. Milstein, agree that permanent blindness is a rare complication of cryptococcal meningitis. When the infection invades the optic nerve, as it did in Popoalii's case, vision loss is rapid and the prognosis for future vision loss is worse. Milstein opines that catching the infection earlier than later generally improves the prognosis for preventing permanent blindness, but he also stated that he did not have enough information to opine within a reasonable degree of medical certainty that in Popoalii's case any earlier treatment would have saved her vision. To the extent that he thinks earlier treatment generally helps, he cannot say at what point during the progression of her illness earlier diagnosis would have helped. None of Popoalii's medical experts has offered any testimony as to specific acts by any medical professionals that fell beneath a standard of reasonable care under the circumstances. Although they have opined generally that earlier treatment for cryptococcal meningitis may have prevented her blindness, they likewise cannot say with any degree of medical certainty

14

that any particular failures or delays in care by any medical personnel, or any delays in obtaining prior medical records, caused or contributed to cause Popoalii's blindness. In fact, Dr. Dreyer has opined that the prior records contained incorrect diagnoses.

Two medical experts retained by Dr. Bloomquist have opined that he provided Popoalii with the same treatment any reasonable and prudent physician would have when presented with the symptoms and history known to him on March 22 or 26. Moreover, these experts have opined that any delay in treating Popoalii did not cause, within a reasonable degree of medical certainty, Popoalii's blindness.

## III.   Discussion

Deliberate indifference to the serious medical needs of prisoners violates the Eighth Amendment's guarantee against cruel and unusual punishment. *Alberson v. Norris,* 458 F.3d 762, 765 (8th Cir. 2006). However, medical malpractice standing alone does not violate the Eighth Amendment. *Smith v. Clarke*, 458 F.3d 720, 724 (8th Cir. 2006). To state a claim of inadequate medical treatment under 42 U.S.C. § 1983, a plaintiff "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

To show deliberate indifference, a plaintiff must prove (1) an objectively serious medical need, and (2) that prison officers knew of the need but deliberately disregarded it. *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005). A serious medical need is one that is so obvious that even a layperson would easily recognize the necessity for a doctor's

attention. *Vaughn v. Greene County*, 438 F.3d 845, 851 (8th Cir. 2006). Deliberately disregarding such a need is a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Olson v. Bloomberg*, 339 F.3d 730, 736 (8th Cir. 2003). Knowledge of risk may be inferred from the record. *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). Intentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention or the actions of the officers are so dangerous that a knowledge of the risk may be presumed." *Id.* Where the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation. *Alberson v. Norris*, 458 F.3d 762, 765-766 (8th Cir. 2006).

### A. Medical Professionals

Viewed in a light most favorable to Popoalii, the evidence before the Court shows that her cryptococcal meningitis went undiagnosed by the medical professionals at WERDCC despite her severe headaches, her sensitivity to light, and her loss of vision. Although WERDCC medical professionals did not have access to her medical records for at least the first week of her incarceration there, Popoalii's medical expert has testified that those records showed little more than her earlier misdiagnosis of viral encephalitis, which she reported to them upon her arrival. The infection she actually suffered from is rare, difficult to diagnose, and is typically accompanied by risk factors and other symptoms which Popoalii did not possess. Had they obtained her earlier records, they would have had access to a previous CT scan and spinal tap, but neither of those tests had

16

led her earlier physicians to diagnose meningitis. Although Popoalii's medical experts have opined that an earlier diagnosis might have prevented some of her vision loss, none of them has offered any opinion that any of the care provided by the medical personnel at WERDCC fell below the standard of care one would expect from a reasonably prudent physician with the same knowledge. But even if her experts believed that malpractice in some way contributed or caused her misdiagnosis, there is absolutely no evidence to suggest that any failures or mistakes were done with deliberate indifference.

### 1.    Nurse Cox

Nurse Cox took Popoalii's initial history upon her arrival at WERDCC. Popoalii reported to him the same diagnosis that he would have read had he seen her medical records. He treated her for a headache and assessed her vital signs as normal. Even if it were somehow negligent for him to not realize immediately that Popoalii's headache was actually caused by meningitis, there is no evidence that he deliberately ignored her need for treatment. Summary judgement is granted to Defendant Cox.

### 2.    Nurse Meyer

Nurse Meyer saw Popoalii on March 20 and 26 for severe headaches. She evaluated Popoalii's eyes, found her to be alert, oriented, balanced and able to speak. She contacted Dr. Bloomquist about increasing Popoalii's dosage of ibuprofen. Even if it were somehow negligent for her to not realize Popoalii had meningitis, there is no evidence that she deliberately ignored her need for treatment. Summary judgement is granted to Defendant Meyer.

### 3. Wendy Hull

Nurse Hull saw Popoalii on March 21 for severe headaches, assessed her vital signs as within normal limits and provided her with a 24-hour lay-in. She also evaluated Popoalii on April 3 before she was sent to administrative segregation for yelling. During that evaluation, Popoalii complained of headache and Hull gave her as much ibuprofen as she could under her prescription. Because her vital signs were normal, Hull deemed Popoalii medically fit for transfer to segregation. There is no evidence that Hull was aware of a more serious medical condition at that time. She evaluated Popoalii the next day when Popoalii began banging her head against the wall. Hull performed eye reflex tests and checked whether her eyes were equal and reactive to light. She also tested neurological function and vital signs. She remained with Popoalii for an hour to observe her, during which time Popoalii did not change or worsen. Even assuming that this treatment was negligent in failing to assess that Popoalii was suffering from meningitis–for which there is no expert medical evidence–there is no evidence that Hull was deliberately indifferent to her suffering or deliberately withheld treatment. Summary judgment is granted to Defendant Hull

### 4. Debbie Welch

Nurse Welch saw Popoalii for complaints of a headache on the morning of March 22. Popoalii told her she had been recently discharged from the hospital with viral meningitis. Welch took her vitals, checked that her pupils were equal and reactive to light, checked that her smile was equal on both sides, and that she could grip, push, and

pull.  Welch contacted CMS Defendant Dr. Sripatt Kulkanthorn to request a course of

medical treatment.  Kulkanthorn prescribed 800mg ibuprofen three times daily for ten

days, which Welch administered.  Welch met with Popoalii again on April 1, but there is

no evidence that Popoalii complained of headache or other symptoms during this meeting.

Even assuming that the treatment provided by Welch somehow fell below a standard of

reasonable care, there is no evidence from which a reasonable juror could find that any

negligence was deliberate or even reckless or that Welch was indifferent to Popoalii's

medical needs.  Summary judgment is granted to Defendant Welch.

### 5.    Raymond Bloomquist

Nurse Oliver[1] asked Dr. Bloomquist to evaluate Popoalii in administrative

segregation on March 22 for symptoms of headache.  When Popoalii mistakenly told

them that she had been previously diagnosed with viral meningitis (as opposed to viral

encephalitis), Bloomquist evaluated her neck and found it flexible with no nuchal rigidity.

He further found that she was responsive, coherent, and her vital signs were stable, and he

ordered ibuprofen for her pain.  Viewed in a light most favorable to Popoalii, there is

evidence from which a reasonable juror could find that Bloomquist was negligent in

failing to notice that Popoalii had complained of light sensitivity since coming to

WERDCC, which is a "red flag" in meningitis cases.  However, there is no evidence that

he was deliberately indifferent to this fact; that is, that he knew about it and deliberately

disregarded it.  Even assuming medical malpractice on the part of Dr. Bloomquist by

---

[1]Defendant Oliver was dismissed from this lawsuit for failure to obtain service.

19

failing to properly discover Popoalii's rare and difficult-to-diagnose infection, for which she had none of the risk factors, there is no evidence from which a reasonable juror could find that his negligence was the result of a reckless disregard or deliberate indifference to her medical needs. Summary judgment will be granted to Defendant Bloomquist.

### 6. Sripatt Kulkanthorn, Vicki Dixon, and Teresa Vanlandingham

Dr. Kulkanthorn prescribed ibuprofen for Popoalii's headaches on March 22 after he was consulted by Nurse Welch. He next saw Popoalii on April 1 for a scheduled appointment in regard to her headaches. Popoalii reported head pain and said she had not been able to see for a couple of days. She reported a history of headaches and a recent diagnosis with viral encephalitis. Kulkanthorn examined Popoalii's head and neck. He examined her eyes and pupils with an opthalmascope and determined that her pupils were equal, reactive to light, and grounded. A neurological exam was also normal. He placed her in the TCU for observation and further evaluation of her headaches in light of her history of encephalitis. He encouraged more fluid intake and ordered a blood count. He prescribed ibuprofen and a shot of Visteril for the headache. He ordered her to lie flat and to be placed on fall precaution due to her vision problems. Popoalii was placed in a room for observation by CMS Defendant Nurse Vanlandingham who assessed her skin, eyes, and vital signs as normal. Vanlandingham had no further contact other than April 1.

Nurse Dixon observed Popoalii during the early morning hours of April 2. She assessed her vital signs, neurological signs, eyes and facial movements as normal, although she also noted that Popoalii began making noises and picking at things in the air.

Dixon refused a request for pain medication at one point because it was not time to administer it and she didn't have permission to give extra medicine from a doctor. That night was Dixon's only contact with Popoalii during times relevant to this lawsuit.

Kulkanthorn saw Popoalii the morning of April 2. She still complained of headaches, but could walk around normally. She could also put her chin to her chest and move her head around without pain which would be inconsistent with meningitis. Her eye movement and neurological function was normal. Kulkanthorn assessed her as post viral encephalitis with headaches, poor vision, and depression. He reviewed her past medical records which Popoalii's mother had faxed to the WERDCC sometime on or before April 2. He reviewed the records of her encephalitis diagnosis and a negative CT scan. He also obtained results of new blood work and liver and thyroid tests.

Although Kulkanthorn ordered that Popoalii remain in the TCU for further observation, she was removed to administrative segregation on April 3 without his consent after she was twice cited for screaming and disturbing other inmates. When he discovered that she'd been removed on April 5, he requested that she be brought back to the TCU. She told him that she could not see any light. He evaluated her pupils which were equal and reactive to light, and he re-checked them with an opthalmascope but found no infection, palsy, or conjunctivitis. Her vital signs were normal and she was calm and alert. Her neck was not sore or stiff and she could move her head normally.

Kulkanthorn requested a consultation with opthalmologist Lee Browning to evaluate Popoalii's visual complaints. He also recommended a neurological consultation

with Dr. Dean and ordered additional blood work.  These consultations eventually led to Popoalii's transfer to the Audrain Medical Center and the University or Missouri Medical Center where she was diagnosed with cryptococcal meningitis.

There is no evidence that either Nurse Vanlandingham or Nurse Dixon was aware of a serious medical need or remained deliberately indifferent to it.  Both saw Popoalii only on single occasions and treated her according to doctors' orders.  Nor is there any evidence that Dr. Kulkanthorn remained deliberately indifferent to any serious medical need of which he was aware.  There is no expert medical testimony that Dr. Kulkanthorn's treatment of Popoalii was negligent given her reported history of viral encephalitis and the mobility and lack of soreness in her neck.  Popoalii argues that he should have been aware of her reported vision problems and light sensitivity earlier because they were in her medical records and are "red flags" for meningitis.  Even assuming that his failure to note these symptoms was negligent despite his observations of her neck and head mobility, negligence alone does not rise to the level of a constitutional violation.  Kulkanthorn placed Popoalii in TCU for observation, and ordered her returned there after she was taken to administrative segregation in his absence.  When he did learn of her vision loss, he ordered further tests and consultations which eventually led to a proper diagnosis.  There is no evidence that he was ever deliberately indifferent to her medical needs.  Summary judgment must be granted to Dr.  Kulkanthorn, Nurse Dixon, and Nurse Vanlandingham.

**B.    Correctional Medical Services**

22

The parties agree that Correctional Medical Services ("CMS") is a governmental entity and thus cannot be held liable under 42 U.S.C. § 1983 absent an unconstitutional policy or custom. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978). The only CMS policy or custom alleged to have deprived Popoalii of a constitutional right is the absence of a system for retrieving a prisoner's medical records when she is transferred to WERDCC. Popoalii offers no evidence that CMS in fact has a policy not to obtain records until a patient is sick. Nor has she offered any evidence that possession of her medical records by CMS personnel would have altered her treatment. The records from St. Joseph's Hospital showed a past diagnosis for viral encephalitis, which Popoalii told CMS professionals herself. She claims that they would have seen an elevated white blood cell count, but there is no evidence that this fact if known would have led to a quicker diagnosis of meningitis. The doctors at St. Joseph's did not diagnose meningitis despite performing the spinal tap; there is no reason to believe that the doctors at WERDCC would have reached a different conclusion given the same information. Moreover, Popoalii's medical records were eventually transmitted to WERDCC by her mother around the end of March or the beginning of April and they were reviewed by Dr. Kulkanthorn. He noted a negative CT scan and various blood and thyroid tests, all of little import in his diagnosis. Even assuming that his diagnosis was negligent, there is no evidence that the records policy of CMS, or the absence of one, contributed in any way to that negligence. Summary judgment must be granted to CMS.

### C.     Department of Corrections Personnel

### 1. Defendants Schoneboom, Foster, and Morris

Popoalii has presented no evidence that she had any contact with Defendants Schoneboom, Foster, and Morris while she was imprisoned at WERDCC, nor does she raise any arguments in opposition to their motion for summary judgment. Summary judgment is granted to these three defendants.

### 2. Defendants Trusty, Vallier, and Ham

Defendant Trusty's only involvement in Popoalii's case was to sign her transfer into administrative segregation on March 22. Trusty did not speak to Popoalii at the time because she had already been interviewed about her conduct violation by Defendant Sharp. There is no evidence that Trusty was aware of a serious medical need or deliberately ignored it. Similarly, Defendant Vallier approved Popoalii's transfer to administrative segregation on April 3 for conduct violations. Like Trusty, Vallier did not speak with Popoalii at the time but simply approved the paperwork. There is no evidence that Vallier was aware of a serious medical need or deliberately ignored it. Defendant Ham was mistakenly named as the shift supervisor on the suicide intervention form filled out by officer Neagles but the evidence shows that Ham actually played no role in Popoalii's suicide intervention. Instead, the actions described under the shift supervisor actions section of the form were actually taken by Ruby Tyler, who is not a party. Popoalii does not recall any contact with Ham; nor does she know why Ham was named as a defendant. Summary judgment is granted to these three defendants.

### 3. Defendants Patterson, Samm, Sharp, Hancock, Taylor, and White

On March 22, 2004, Popoalii was taken to Defendant Patterson for special educational assessment. When Popoalii told Patterson that she was unable to perform the test due to her headache, Patterson called the nursing unit to report her complaint but was told that Popoalii had just been seen, that there was nothing wrong with her, and that she did not have a lay-in. Patterson next called officer Samm who came to speak with Popoalii, but Popoalii was still unable to perform the test and asked to be taken to administrative segregation to lie down. Samm contacted the Receiving and Orientation Unit where Popoalii was housed and was told that Popoalii had just been to the medical unit and that she did not have a lay-in. Samm and Patterson tried to persuade Popoalii to finish the testing but Popoalii continued to say she as unable and that she should be taken to segregation to lie down. Samm issued a conduct violation for insubordination, which was read to Popoalii by Defendant Sharp. Popoalii gave no statement at the time and did not ask for medical assistance. She was taken to administrative segregation for the violation, where she complained to Defendant Hancock of severe back pain. As Hancock has no medical training, she contacted a nurse in the medical unit and was told Popoalii did not need medical assistance. There is no evidence that Patterson, Samm, Sharp, or Hancock had any reason to believe Popoalii had a serious medical need. The only indication of such need was Popoalii's complaint for which there was no objective corroboration. Patterson, Samm, and Hancock contacted medical personnel who told them Popoalii did not need further attention. No reasonable juror could find that they were deliberately indifferent to her medical needs.

Hancock issued another conduct violation to Popoalii a week later for failing to sit up when ordered to do so during a headcount. The violation was read to Popoalii by Defendant Taylor. Although Popoalii told Hancock that her head hurt, she did not tell Taylor of the pain and she did not request medical treatment from either officer. Defendant White conducted a disciplinary hearing regarding the conduct violation, but did not actually see Popoalii during the hearing. Instead, she contacted Popoalii by intercom, but Popoalii declined to participate in the hearing. She did not ask for medical treatment. No reasonable juror could find that Hancock, Taylor, or White was aware of a serious medical need, let alone that they deliberately ignored it. Summary judgment will be granted to these defendants.

### 4.     Defendants Rose, Neagles, Wilder, Schmidt, Nichols, and Dunn

Popoalii was placed in the TCU on April when she complained that she could not see. The TCU is staffed with Corrections personnel for safety and security reasons. Such personnel are not told the nature of a prisoner's need for medical care, but they are aware that there is some need. At various times over the next three days, Popoalii had several outbursts of yelling. Defendants Rose, Dunn, and Wilder tried repeatedly to get Popoalii to calm down as her screaming was disrupting the care of other patients in the TCU. Rose and Wilder eventually issued conduct violations when Popoalii continued to scream. The violations were read to her by Defendants Nichols and Neagles. Popoalii told Nichols, "God my head hurts, I can't see very well. I haven't been able to see for the last two days. I want to sign [the conduct violation] but I can't see." She also told Neagles

that she couldn't see the violation form to sign it. A third conduct violation issued by Defendant Wilder was read to Popoalii by Defendant Schmidt on April 3, but she made no statement in response.

From April 1 through April 3, Popoalii was in the TCU under the care of medical personnel. There is no evidence that any of the citations or any other conduct by the officers impeded medical treatment while she was in the TCU. Nor is there any evidence that the officers were aware of a serious medical need to which they were deliberately indifferent. It is unclear what action Popoalii thinks the officers should have taken during that time other than not issuing conduct violations for her screaming. No reasonable juror could find that these defendants were aware of or were deliberately indifferent to a serious medical need during those three days.

Because the conduct violations (and the medical treatment she was receiving in the TCU) failed to stop Popoalii's screaming, she was transferred back to administrative segregation for the benefit of the other prisoners in the TCU. Before the transfer, she was examined by Nurse Hull who gave her as much ibuprofen as she could under her prescription when Popoalii complained of a severe headache. Because her vital signs were normal, however, Hull deemed Popoalii medically fit for transfer to segregation. There is no evidence that the custodial officers had any reason to doubt the assessment by trained medical personnel. If a nurse was not aware of a serious medical need, there is no reason why lay security officers should have been aware of one.

On April 4, Neagles observed Popoalii hitting her head against the cell wall.  He contacted medical personnel and placed her on full suicide watch in a padded cell.  While her behavior arguably constituted a serious medical need, Neagles complied with standard procedure and obtained medical care for here.  There is no evidence that he delayed in doing so or that he was otherwise indifferent to her needs.  Summary judgment is warranted in favor of all these defendants.

## IV.    Conclusion

The Court is not unsympathetic to Popoalii's suffering or the tragic illness that led to her blindness.  It is truly unfortunate that none of the medical professionals at St. Joseph's Hospital or WERDCC were able to discover or treat the cause of Popoalii's pain in time to save her vision.  But whatever shortfalls there may have been in her care, there is no evidence that any of the Defendants in this case acted, or failed to act, out of deliberate indifference to her serious medical needs.  Although she suffered a terrible and permanent injury during her incarceration, Popoalii's Eighth Amendment rights were not violated.

Accordingly, it is hereby

ORDERED that the Motions to Strike the Affidavit of Dr. Dreyer [Docs. # 239 and 243], and the Motions for Summary Judgment filed on behalf of the DOC Defendants [Doc. # 228], the CMS Defendants [Doc. # 229], and Dr. Bloomquist [Doc. # 227] are all GRANTED.

28

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  December 21, 2006
Jefferson City, Missouri